IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JENNIFER V.T., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:22CV417 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Jennifer V.T. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on November 16, 2019, alleging a disability onset date of November 19, 2017. (Tr. at 15, 184-90.)[1] She later amended her alleged onset date to January 3, 2020. (Tr. at 15, 209-10.) Plaintiff's application was denied initially (Tr. at 64-77, 98-101) and upon reconsideration (Tr. at 78-94, 104-12). Thereafter, she requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 113-14.) On January 13, 2022, Plaintiff, along with her non-attorney representative,

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #7].

attended the subsequent telephonic hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 15.) Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 28), and on April 1, 2022, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets and quotation omitted).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (internal quotation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

Case 1:22-cv-00417-JEP   Document 17   Filed 09/29/23   Page 2 of 17

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 *et seq.*, provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 *et seq.*, provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

3

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her amended alleged onset date of January 3, 2020. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 17.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> degenerative tear of acetabular labrum of hips, status-post surgeries; migraines; hyperthyroidism/hypothyroidism; adjustment disorder; anxiety; depressive disorder; gastroesophageal reflux disease (GERD); impaired glucose tolerance; insomnia; irritable bowel syndrome; asthma; sleep apnea; plantar fasciitis/Achilles tendonitis/pes; planus; shoulder impingement; hyperlipidemia; degenerative disc disease; allergic rhinitis; tenosynovitis of the tibialis posterior tendon; PTSD; obesity[.]

(Tr. at 17.) The ALJ found at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 18-21.) He therefore assessed Plaintiff's RFC and determined that she could perform sedentary work with the following, non-exertional limitations:

> [Plaintiff] can occasionally push, pull and operate foot controls with the lower extremities. [Plaintiff] can occasionally climb ramps and stairs, but no climbing

5

ladders, ropes, or scaffolds. [Plaintiff] can occasionally balance, stoop, kneel, crouch, and crawl. [Plaintiff] must avoid all exposure to workplace hazards, such as dangerous moving machinery and unprotected heights. [Plaintiff] is generally able to understand and perform simple, routine, repetitive tasks, and is generally able to maintain concentration, persistence and pace to stay on task for 2-hour periods at a time over the course of [a] typical 8-hour workday with normal breaks in order to perform such tasks, in a low stress work setting, which, in addition to the nature of the work being performed, is further defined to mean no production-pace or quota-based; rather, [Plaintiff] requires a goal-oriented job that primarily deals with things instead of people, with no more than occasional social interaction as part of the job with supervisors, co-workers and the public. [Plaintiff] requires the use of an assistive device, such as a cane, for ambulation only, which will only require the use of one upper extremity to operate.

(Tr. at 21-22.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that all of Plaintiff's past relevant work exceeded her RFC. (Tr. at 27.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 27-28.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 28.)

Plaintiff now raises two challenges to the ALJ's RFC assessment. Specifically, she contends that the ALJ erred by (1) failing to "perform a function-by-function analysis of Plaintiff's contested and relevant ability to sit," and (2) failing to "perform any analysis of the evidence or vocational effects of Plaintiff's severe migraines." (Pl.'s Br. [Doc. #13] at 1.) After a thorough review of the record, the Court finds that both of Plaintiff's arguments require remand.

A. Function-by-Function Assessment

Plaintiff first argues that, in assessing her RFC, the ALJ erred by failing to perform a function-by-function evaluation of evidence relating to Plaintiff's ability to sit, despite

6

evidence suggesting greater limitations. As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. Social Security Ruling 96-8p: <u>Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims</u>, SSR 96-8p, 61 Fed. Reg. 34474, 34475, 1996 WL 374184, at *1 (July 2, 1996). "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." <u>Monroe v. Colvin</u>, 826 F.3d 176, 179 (4th Cir. 2016) (internal quotation omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 61 Fed. Reg. at 34478, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from that evidence to his conclusion." <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (internal brackets, emphases, and quotation omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" <u>Mascio v. Colvin</u>, 780 F.3d 632, 636 (4th Cir. 2015) (quoting <u>Cichocki v. Astrue</u>, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." <u>Mascio</u>, 780 F.3d at 636 (quoting <u>Cichocki</u>, 729 F.3d at 177).

7

The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Mascio, 780 F.3d at 637.

Here, as set out above, Plaintiff challenges the ALJ's analysis of evidence relating to Plaintiff's ability to sit. Because Plaintiff's RFC restricts her to a limited range of sedentary work, her primary contention focuses on evidence suggesting that she would experience difficulty sitting for extended periods of time. As she correctly notes, the regulations define sedentary work as involving standing and walking for up to two hours per eight-hour workday, with the remaining time spent sitting, resulting in sitting for at least six hours per day.

In his decision, the ALJ noted Plaintiff's hip impairments and her testimony that she is only able to sit for 10 to 15 minutes. (Tr. at 22, 44.) The ALJ included "degenerative tear of acetabular labrum of hips, status-post surgeries" among Plaintiff's severe impairments at step two of the sequential analysis (Tr. at 17) and recounted Plaintiff's testimony that "she sustained injuries during her military service and underwent surgeries on her hip" (Tr. at 22). In fact, Plaintiff's testimony and medical records indicate that she suffered from bilateral hip dysplasia and deformity of the bilateral femoral heads (Tr. at 1200), with enthesopathy of both hip regions with femoroacetabular impingement of both hips (Tr. at 1136), and in 2020, both of her hips required periacetabular osteotomy, a surgical procedure to correct the angle of the hip joint (Tr. at 41, 1922, 1946). Plaintiff further testified that she suffered a pelvic fracture later in 2020. (Tr. at 41, 1929, 1934, 1946.) These records reflect ongoing reports of pain

8

aggravated by sitting, including after the surgeries and post-surgical fracture. (Tr. at 500-01, 505, 877-78, 921, 950-52, 1606, 1620, 1795-96, 1941.) The ALJ recounted some of Plaintiff's medical records reflecting that she reported to her doctors that she experienced pain when sitting, and the ALJ noted Plaintiff's hearing testimony that due to her ongoing hip pain and other symptoms, she "is able to sit 10 to 15 minutes before needing to stand and change positions." (Tr. at 22, 44.) In full, Plaintiff testified as follows regarding her ability to sit:

> [Q] And what about sitting, do you have difficulty sitting upright, like sitting upright in a chair?
>
> A Yes. I'm constantly having to shift because of my hip and my lower back. And sitting for more than 10 to 15 minutes, I do have to get up and use my walker to walk around for a few minutes before sitting back again, back down again. And that, also, includes laying down. So, when I'm laying down in bed to go to sleep at night, I'm constantly waking up throughout the night because of pain.
>
> Q Okay. So, what -- do you have a position you spend most of your time in during the day, or how does that work?
>
> A Again, like if I'm at home and I'm sitting on my couch, I tend to sit with my feet handing off my couch, like so in a typical sitting position. But around that 10 to 15-minute mark, I'm having to get up and walk around for a few minutes. And then I can sit back down again, but it's constantly having to sit, get up, walk around, sit, get up, walk around.

(Tr. at 43-44.)

The ALJ ultimately determined that Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms [were] not persuasive of disability based upon the medical and other evidence in the record, for the reasons explained in [the] decision." (Tr. at 26.) Specifically with respect to Plaintiff's "hip pain status post-surgery" in conjunction with her obesity, the ALJ found it reasonable that Plaintiff would have limitations on her ability to perform work-related activities, and therefore limited her to a range of sedentary exertion

9

work with the use of an assistive device for ambulation. (Tr. at 17, 25-26.) The ALJ relied upon the findings of the state agency medical consultants that Plaintiff remained capable of medium work with frequent postural limitations, but in light of her surgeries and obesity the ALJ instead limited her to sedentary work. (Tr. at 21, 26.) However, the RFC does not include any limitations with respect to sitting, which would necessarily increase with a reduction to sedentary work. The ALJ made no findings contrary to Plaintiff's stated sitting limitations of 10-15 minutes and failed to address the contested function of sitting at all in the administrative decision.

In a similar recent case, Dowling v. Commissioner of Social Security Administration, 986 F.3d 377, 388 (4th Cir. 2021), the appellant "argued throughout her administrative and judicial proceedings that her IBD and anal fissure cause her to experience discomfort when she sits for a prolonged period of time." Nevertheless, "the ALJ apparently concluded that Appellant was not restricted in her ability to sit, as he did not indicate that her RFC was limited because of those problems." Id. In finding that the ALJ's lack of analysis required remand, the Fourth Circuit explained as follows:

> This conclusion should have been the result of an analysis that was separate from the ALJ's appraisal of Appellant's ability to perform other functions, and should have been accompanied by "a narrative discussion describing" the evidence supporting it. The ALJ's evaluation of Appellant's ability to sit was lacking in both respects. The ALJ never specifically discussed the extent to which Appellant's alleged sitting problems impacted her ability to perform sedentary work. The ALJ could not have supported a conclusion in this regard through a narrative discussion concerning the relevant evidence because he reached no such express conclusion in the first instance. In fact, the ALJ barely mentioned Appellant's sitting problems in his decision, and discussed them only when rattling off a laundry list of her many impairments and functional restrictions. This grouping of Appellant's sitting limitations with her other impairments and restrictions is a far cry from the "function-by-function analysis" the ALJ was required to conduct.

10

Id. (internal citation omitted). In the present case, as in Dowling, the ALJ "never specifically discussed the extent to which [the claimant's] alleged sitting problems impacted her ability to perform sedentary work." Id. Therefore, as in Dowling, it appears that remand is required so that the ALJ can undertake this function-by-function analysis in the first instance.[4]

The Court has considered whether the error is harmless in this case based on the vocational expert testimony, which suggests that the jobs relied upon by the ALJ at step five of the sequential analysis may incorporate a sit/stand option. Specifically, the vocational expert testified:

> [Q]   So, what if, also -- considering my first hypothetical, what if the person, you know, needed to like get up? I know these are sedentary jobs, so they're primarily seated positions. So, what if -- do they have any flexibility for the person if they need to maybe get up and either maybe work while they're standing for a few minutes or just get up and walk around and sit back down for a few minutes? Is there any flexibility for that, like a sit/stand option?
>
> A   Yes, Your Honor. With respect to the SVP: 2 sedentary job titles, I would say that the majority of those jobs, at least 90 of 137, would allow a sit/stand option. And the workstations that I've observed physically have the table height at about 40" with a barstool type to sit on, basically standing and/or sitting with -- to keep the person at the workstation height, Your Honor. So, yes, the sit/stand option is built into the modern sedentary unskilled market.
>
> Q   The three jobs that you gave me [have] that flexibility?
>
> A   Yes, sir. They would.

---

[4] Defendant's brief includes an extended discussion of the medical records, particularly noting medical records reflecting improvement in Plaintiff's hips after her surgery. (Def.'s Br. [Doc. #14] at 4-7, 18.) Defendant also notes the ALJ's general discussion of the medical history. (Def.'s Br. at 15-18.) However, the ALJ did not make any findings regarding Plaintiff's ability to sit, and for this Court to now attempt to make such a determination would usurp the ALJ's role as fact finder. See Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 87 (1943) (courts must review administrative decisions on the grounds upon which the record discloses the action was based); Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726, at *1 (M.D.N.C. Mar. 25, 2014) (same).

11

(Tr. at 55.) However, the fact remains that the administrative decision omitted all discussion of Plaintiff's contested ability to sit and ultimately included no sitting restrictions in the RFC. Although the ALJ asked about the impact of a sit/stand option on the occupational base, he ultimately declined to include one in Plaintiff's RFC assessment. Thus, the vocational expert's testimony on the subject is inapposite to the RFC as written, and cannot serve to "correct" a mistake at an earlier step of the analysis. Moreover, the vocational expert's testimony further reveals that, even if a sit/stand option were included in the RFC, it would still exceed Plaintiff's alleged sitting limitations. When asked by the ALJ if a hypothetical person could alternate between sitting and standing "as much as they want to," the vocational expert responded as follows:

> Your Honor, typically a person is going to have to be able to sustain sitting for at least 30 to 45 minutes and should be able to stand for at least 10 to 15 minutes to get through an hour, to meet even the modest production rate.

(Tr. at 55-56.) On further questioning from Plaintiff's counsel, the vocational expert testified that alternating positions every 15 minutes would be "inconsistent with meeting the production norms." (Tr. at 58.) Thus, the sit/stand option discussed by the vocational expert would require sitting 30 to 45 minutes every hour for an eight-hour day, much longer than the 10 to 15 minutes of sitting at a time that Plaintiff outlined in her testimony. Given that discrepancy, the Court cannot find that the error here was harmless. As in Dowling, the ALJ in this case "did not properly assess the extent to which [Plaintiff's] sitting problems impacted her ability to work." 986 F.3d at 388. In light of this error, substantial evidence fails to support the ALJ's decision, and the matter must be remanded for further proceedings.

12

B. Migraines

The ALJ's similar lack of analysis regarding Plaintiff's migraines presents an additional basis for remand. Plaintiff correctly contends that the ALJ "fail[ed] to perform any analysis of the evidence or vocational effects of Plaintiff's severe migraines" when assessing her RFC, despite having included migraines among Plaintiff's severe impairments at step two of the sequential analysis. (Pl.'s Br. at 1, 14.) She notes that the ALJ did "not place any limitations in the RFC which relate to her migraines such as light or sound avoidance, off task time or absences." (Pl.'s Br. at 14.) As recounted in her brief,

> [Plaintiff] testified that she suffers from chronic migraine headaches for which she receives Botox injections every 10 to 12 weeks. The injections are helpful such that she now only has breakthrough migraines once or twice per month. When she experiences these breakthrough migraines, they generally last all day, and she has to stay in her bedroom with the lights off and no sound. The [vocational expert] testified that [if Plaintiff] were consistently absent even one day per month such that she exceeded 8 days of absences in a rolling 12-month period, then she would not be competitively employable. He also testified that if [Plaintiff] were off task for 8% or more of the workday, then she would be unemployable.

(Pl.'s Br. at 14) (internal citations to the record omitted) (citing Tr. at 47-48, 56-57).

Plaintiff argues that, "[e]ven if the ALJ felt that the record did not sufficiently demonstrate that [Plaintiff's] migraines were occurring once or twice per month as testified, he needed to make specific findings as to how often and for how long he did think the record showed they were occurring." (Pl.'s Br. at 17.) Plaintiff further contends that, because the ALJ failed to do so or "discuss *any* of the medical evidence regarding [Plaintiff's] migraines," his decision "cannot be upheld." (Pl.'s Br. at 17) (citing Moore v. Colvin, 743 F.3d 1118, 1127 (7th Cir. 2014) ("The ALJ's decision did not reflect any likelihood of absences or breaks at work related to migraines, and that is simply unsupported by the record."); Tiffany M. v.

13

Berryhill, No. TMD 18-1766, 2019 WL 1596982, at *5 (D. Md. Apr. 15, 2019) ("The ALJ failed to explain how, despite Plaintiff's migraine headaches, she could remain on task for at [least] 85% of an eight-hour workday and not miss more than one day of work per month."); Najjar v. Comm'r of Soc. Sec., No. 16-CV-13472, 2017 WL 840421, at *2 (E.D. Mich. Mar. 3, 2017) ("On remand, the ALJ must make specific findings as to the severity, frequency, and duration of plaintiff's headaches, and, as appropriate, revise her RFC evaluation of plaintiff and her hypothetical question(s) to the VE accordingly.")).

In response, Defendant contends that "there was no need for the ALJ to discuss the majority of the records related to Plaintiff's migraines, as Plaintiff admits that her headaches were well-controlled with treatment" during the time period at issue. (Def.'s Br. [Doc. #14] at 21) (citing Tr. at 48). "Thus," Defendant argues, "there were no material inconsistencies that merited discussion." (Def.'s Br. at 21) (citing SSR 96-8p, 61 Fed. Reg. at 34478, 1996 WL 374184, at *7 (requiring ALJs to "explain how any material consistencies or ambiguities in the evidence in the case record were considered and resolved")). Notably, however, the ALJ did not make any such finding or rely on any determination that Plaintiff's headaches were well-controlled. Indeed, the ALJ did not mention Plaintiff's migraines at all in the course of his RFC analysis. In fact, the only place migraines appear in the administrative decision is in the list of severe impairments at step two of the analysis. (Tr. at 17.) To the extent that Defendant provides various reasons for discounting Plaintiff's testimony regarding ongoing breakthrough headaches (Def.'s Br. at 21-23), the Court notes that the ALJ could certainly have made those types of findings but did not do so here. The ALJ did not address Plaintiff's headaches at all,

14

and these are findings for the ALJ to make in the first instance, not the Court. As noted in Anderson v. Colvin, this Court's

> [r]eview of the ALJ's ruling is limited . . . by the so-called "Chenery Doctrine," which prohibits courts from considering *post hoc* rationalizations in defense of administrative agency decisions. Under the doctrine, a reviewing court "must judge the propriety of agency action solely by the grounds invoked by the agency." "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."

Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726, at *1 (M.D.N.C. Mar. 25, 2014) (internal brackets and citations omitted) (quoting Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 196 (1947)).

Moreover, the Court notes that Plaintiff disputes Defendant's assertions regarding the extent to which her headaches were under control, contending that,

> [although] her migraines had previously been under better control – it was in February of 2021, after she had already completed her initial disability application paperwork, that her headaches increased in frequency despite Botox injections. [Plaintiff's] September 2021 records reflect, consistent with her testimony, that she was having more breakthrough headaches and that she told her doctors[,] "the effect of the Botox is wearing off. I want to know my options."

(Pl.'s Reply Br. [Doc. #15] at 3) (internal citations to the record omitted) (citing Tr. at 1696-98, 1703-04). The medical records reflect that Plaintiff reported headaches almost daily when not on Botox and a decrease in frequency with regular Botox injections, but with some complaints of worsening headaches and breakthrough migraines throughout the relevant period, including in 2021. (Tr. at 425, 455, 475-76, 493, 508, 542, 590, 668, 743, 1189, 1191, 1206, 1252, 1554, 1607, 1652, 1696-97, 1703-04, 1707, 1769-70.) The medical records further reflect that Plaintiff's providers shortened her Botox injection cycle to 10 weeks in September

15

2021 to address her increasing breakthrough headaches, and during her November 17, 2021 appointment, Plaintiff reported "improvement in migraines from [her] last [B]otox injection." (Tr. at 1652, 1703-04). Plaintiff similarly testified at the administrative hearing that "[t]he Botox really helps," and she referred to her "breakthrough" migraines as occasional. (Tr. at 47-48.) However, she also testified that these breakthrough migraines still happen "about once to two times a month at this point," and when she does have these breakthrough migraines, they "typically" last all day, requiring that she "stay in [her] bedroom [with] the lights off, no sound" when they occur. (Tr. at 48.)

Thus, there is a material issue regarding Plaintiff's breakthrough migraines with respect to frequency and impact on her ability to work. As noted above, the ALJ did not mention Plaintiff's migraines at all in the course of his RFC analysis. The ALJ found that her migraines were a severe impairment, and therefore necessarily would have "more than a minimal effect on [Plaintiff's] ability to perform basic work activities" (Tr. at 17), and there was testimony and medical evidence that this "effect" may consist of absences or time off task, but the ALJ failed to incorporate these limitations or explain their absence. See Woody v. Kijakazi, No. 22-1437, 2023 WL 5745359, at *1 (4th Cir. Sept. 6, 2023) (remanding where the ALJ failed to make "specific findings regarding how often [the plaintiff] would be absent from work due to the frequency and severity of her headaches"). Because the ALJ again failed "to assess [the] claimant's capacity to perform relevant functions, despite contradictory evidence in the record," Mascio, 780 F.3d at 636 (quoting Cichocki, 729 F.3d at 177), Plaintiff's second contention presents an additional basis for remand.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is REVERSED, and that the matter is REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner is directed to remand the matter to the ALJ for further consideration of Plaintiff's claim. Defendant's Motion for Judgment on the Pleadings [Doc. #16] is DENIED, and Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #12] is GRANTED to the extent set out herein. However, to the extent Plaintiff seeks an immediate award of benefits, her Motion is DENIED.

This, the 29th day of September, 2023.

/s/ Joi Elizabeth Peake
United States Magistrate Judge